[No. 23345.    Department One.    January 19, 1932.]

R. J. ROBERTS, *Appellant,* v. J. & H. GOODWIN, LTD., *Respondent.*[1]

*Moulton & Powell,* for appellant.

*LaBerge, Cheney & Hutcheson,* for respondent.

PARKER, J.—The plaintiff, hereinafter called Roberts, commenced this action in the superior court for Yakima county, seeking recovery from the defendant, hereinafter called Goodwin, upon one cause of action, for

[1]Reported in 7 P. (2d) 8.

the alleged conversion by Goodwin of 1,021 boxes of Winesap apples alleged to belong to Roberts; and upon a second cause of action, for the alleged conversion by Goodwin of 756 boxes of Rome Beauty apples alleged to belong to Ira C. Hawley, which were by him assigned to Roberts before the commencement of this action. Roberts prayed for judgment against Goodwin in the sum of $2,313, the alleged value of the 1,021 boxes of apples, and in the sum of $1,192, the alleged value of the 756 boxes of apples.

Goodwin answered, denying ownership of the apples in Roberts and Hawley. Goodwin, by an affirmative defense, claimed a lien upon all of the apples to secure loans of money owing by K. Lane Johnson to Goodwin, the lien being evidenced by negotiable warehouse receipts for the apples issued to Johnson and assigned to Goodwin, and the loan being evidenced by promissory notes; and also claimed the right to sell the apples, which right was accordingly exercised, applying the proceeds of the sale in partial satisfaction of the loan indebtedness of Johnson.

Goodwin also, as a second affirmative defense to the second cause of action, alleged the pendency of another action between Hawley and Goodwin in the superior court for Benton county, involving, as it is claimed, the same controversy as is here involved in the second cause of action.

Roberts replied by appropriate denials to the affirmative defenses of Goodwin.

The trial judge, viewing the issues so made, ruled that the cause became one of equitable cognizance. The trial proceeded accordingly, though the trial judge impaneled a jury to aid him in an advisory capacity in determining questions of fact, should he find the need of such aid. At the conclusion of the evidence

introduced in behalf of Roberts, counsel for Goodwin moved for judgment denying relief as prayed for. This motion was by the court granted, and final judgment of dismissal was rendered accordingly, from which Roberts has appealed to this court.

During and prior to the times in question, Roberts and Hawley were each growers of apples, their orchards being near White Bluffs, in Benton county. During and prior to the times in question, Goodwin was an English concern, dealing in apples, maintaining its headquarters for its business in this state at Yakima. During and prior to the times in question, K. Lane Johnson was a broker, maintaining his place of business at Yakima, engaged in making contracts with growers of apples, while their crops were maturing, for the marketing of such crops, and making cash advances to growers to aid them in financing their growing, caring for and gathering of such crops.

In the spring of 1928, Roberts and Johnson entered into a contract, reading, in so far as need be here noticed, as follows:

"THIS MEMORANDUM OF AGREEMENT, Made and entered into this 4th day of May, 1928, by and between R. J. Roberts, as party of the first part, hereinafter called the Shipper, and K. Lane Johnson, Yakima, Washington, as party of the second part, hereinafter called the Company.

"WITNESSETH: That in consideration of the mutually dependent promises as hereinafter stated, the parties agree:

"First: That the Shipper agrees to and does hereby employ the Company as his agent in the marketing and selling of all of the hereinafter described crop or crops of fruit now growing on or to be harvested during the season of 1928 from the ranch owned or operated by the Shipper consisting of . . .

"It is the intention of this agreement that the Company shall market and sell the entire crop of fruit

enumerated above and to be grown upon said premises and harvested therefrom during the season of 1928. In rendering its services to the Shipper as agent in the marketing and selling of said fruit the Company shall and will do and perform every necessary and proper thing properly and expeditiously to handle, market and sell said fruit to the best of its ability and to obtain the best price it is able to obtain; *Provided however, that the Company shall be the sole and exclusive judge of the manner and time of selling said fruit and the price to be taken therefor.*

"Second: That the Company accepts such employment by the Shipper and agrees to and will do to the best of its ability and according to its experience and best judgment, market and sell said fruit for the shipper.

"Third: That for the services to be performed by the Company for the shipper in the marketing and selling of said fruit the Shipper agrees to and will pay the Company, and the Company agrees to and will accept and receive as its compensation ten cents per packed box.

"Also a reasonable charge for services performed in addition to selling and marketing, such as packing, loading and labeling, warehousing, storage, etc. *It is expressly understood and agreed that the Company shall have the right and privilege to have any and all remittances from the sale of said fruit made directly to it and that it shall have the right to deduct from such remittances its own compensation for its services as above mentioned and any other advances made by it for said Shipper's account.*

"Fourth: *That the shipper shall deliver all of said fruit to the Company on board cars or at the Company's warehouse and thereafter the Company shall have the entire and exclusive charge of handling, marketing, and selling said fruit. . . .*

"Fifth: That it is acknowledged by the Shipper that the Company has this day paid to him as an advance upon this contract, the sum of *One Dollar.* Three Hundred ($300.00) Dollars and further agrees to ad-

vance Three Hundred ($300.00) for thinning when needed.

"Sixth: That it is expressly understood and agreed that all sums paid by the Company to the Shipper or for his benefit, as advances or otherwise, and all sums now or hereafter owing to the Company from the Shipper for spray materials, supplies or other commodities sold to him, shall be retained by the Company out of the proceeds from the sale of the above mentioned crops, and if said proceeds are not sufficient to cover said sums so advanced or owing, then the balance due the company shall be paid to the company by the Shipper in cash, . . . "

We have italicized portions of the contract to be particularly noticed.

The contract was executed by the filling in and signing of a printed form, of common use in the fruit growing sections of Yakima and White Bluffs, thus accounting for Roberts being called "shipper" and Johnson being called "company."

Johnson made cash advances to Roberts from time to time, aggregating much more in amount than he was by the terms of the contract required to make. When Roberts' crop matured in the fall of 1928, he gathered and delivered the apples here in question at the warehouse of the Priest Rapids Ice & Cold Storage Company at White Bluffs; that, manifestly, being the warehouse agreed upon for the delivery of those apples.

During the spring of 1928, Hawley and Johnson entered into an oral contract looking to the marketing by Johnson of Hawley's apple crop of that year, concededly of the same import as the contract between Roberts and Johnson above noticed; both being well acquainted with that standard form of contract. Johnson made cash advances to Hawley from time to time, aggregating more in amount than he was, by the terms

of the contract, required to make. When Hawley's crop matured in the fall of 1928, he gathered and delivered the apples here in question, and some others of his crop, at the warehouse of the Priest Rapids Ice & Cold Storage Company at White Bluffs; that, manifestly, being the warehouse agreed upon for the delivery of those apples.

On November 26, 1928, the storage company issued and delivered to Johnson its warehouse receipt No. 83, evidencing its holding for Johnson, subject to his order, 14,422 boxes of Winesap apples, further designating them as "Ira Hawley Lot." The proceeds of those apples are only incidentally here involved. On the same day, the storage company issued and delivered to Johnson its warehouse receipt No. 84, evidencing its holding for Johnson, subject to his order, 1,171 boxes of Winesap apples, further designating them as "R. J. Roberts Lot." The proceeds of 1,021 boxes of those apples are here involved. On the same day, the storage company issued and delivered to Johnson its warehouse receipt No. 85, evidencing its holding for Johnson, subject to his order, 756 boxes of Rome Beauty apples, further designating them as "Ira Hawley Lot." The proceeds of those apples are here involved.

The evidence seems to us to convincingly show the consent of both Roberts and Hawley that the storage company issue to Johnson each of the three warehouse receipts, to the end that he might use them in financing his business, including his advances to Roberts and Hawley, pending the holding of the apples in storage with the prospect of obtaining a more advantageous sale of them in the interest of Roberts and Hawley.

On December 7, 1928, Johnson became indebted to the Yakima Finance Company in the sum of fifteen.

thousand dollars, which was evidenced by his promissory note given to it on that day. To secure that indebtedness, Johnson transferred, by proper indorsement, and delivered to the finance company these three warehouse receipts.

In March, 1929, it was agreed between Johnson and Goodwin that Goodwin would purchase the note given by Johnson to Yakima Finance Company, on which there was then owing an unpaid balance of $11,749, and loan to Johnson twenty thousand dollars additional, and, to secure the whole $31,749 indebtedness, Johnson was to cause the Yakima Finance Company to deliver to Goodwin these three warehouse receipts. This was accordingly done; the warehouse receipts being, by direction of Johnson, delivered by the Yakima Finance Company to Goodwin. Johnson's indorsement was already on each of the warehouse receipts; so nothing further was required to transfer them to Goodwin as security for the $31,749 indebtedness owing by Johnson.

In April or May, 1929, the apples here in question were sold by Goodwin, Johnson consenting, and the proceeds thereof credited by Goodwin on Johnson's indebtedness, leaving a large portion of that indebtedness unpaid. The proceeds of the other apples covered by the warehouse receipt No. 85 are or were involved in the action of Hawley against Goodwin pending in Benton county, which proceeds, together with the proceeds of the apples here involved, fall short of the amount of Johnson's indebtedness to Goodwin.

It is first contended in behalf of Roberts that each of the warehouse receipts is non-negotiable, and so appears upon its face; and that, therefore, Goodwin was bound to take notice of any want of title to the apples in Johnson, and any want of authority in John-

son to pledge them by transfer of the receipts to secure his indebtedness to Goodwin.

Upon the face of each receipt there are printed in plain, large letters the words "negotiable warehouse receipt." There are printed in the body of each receipt the words:

"The receipt is intended as a negotiable receipt and must be presented with and accompany all delivery orders, and it is specifically agreed that no delivery shall be made without its surrender."

There is no language in any of the receipts indicating to the contrary of these quoted words. It is true that each receipt reads: "Received from K. Lane Johnson," followed by description of the apples, specifying the quantity received, unaccompanied by express words that the apples will be delivered to the bearer of the receipt or to the order of Johnson. But, manifestly, each of the receipts, when read in the light of the above quoted words therein, plainly means the latter. In all other respects, each receipt has all the statutory requirements of negotiability.

Our warehouse receipts statute, our analogous bills of lading statute, and our decisions thereunder, we think, clearly call for the conclusion that each of these receipts is a negotiable warehouse receipt, and that Goodwin had the right to so regard them. Rem. Comp. Stat., §§ 3587 *et seq.; State Bank v. Nebraska Bridge etc., Co.,* 87 Wash. 142, 151 Pac. 253; *Klock Produce Co. v. Diamond Ice etc., Co.,* 90 Wash. 67, 155 Pac. 414.

It is next contended in behalf of Roberts that, under the contracts between him and Johnson and between Hawley and Johnson, Johnson had no right to procure and take from the storage company negotiable warehouse receipts for the apples and thereafter pledge the apples by transfer of the receipts to Good-

win to secure his indebtedness to Goodwin; the argument being, in substance, that Johnson could not, in any event, pledge to Goodwin any better title in the apples than he himself had; which, as it is claimed, was nothing more than his right to possession of the apples for the purpose of sale and accounting for the proceeds thereof to Roberts and Hawley.

We think the answer to this contention is that Roberts and Hawley consented to the issuance of the negotiable warehouse receipts by the storage company to Johnson; thus putting it within the power of Johnson, not only to sell the apples, but to pledge or do anything else with them in so far as his innocent pledgee or transferee might be concerned. It is argued in this connection that Goodwin was not an innocent pledgee of Johnson, because of knowledge that Goodwin must have had, suggested by the descriptions of the apples in the receipts, they being referred to as "R. J. Roberts Lot" and "Ira Hawley Lot." We do not think this can be deemed notice to Goodwin that either Roberts or Hawley was then owner of these particular lots of apples.

The very fact that Goodwin had negotiable warehouse receipts for the apples negatives the idea that Johnson was other than the owner of the apples, or that he did not possess absolute power to dispose of or pledge them as his own. We have seen that Roberts and Hawley caused Johnson to be put into this position in so far as third parties might be concerned.

Besides, the apples were actually sold by Goodwin with the consent of Johnson, which, so far as the rights of Roberts and Hawley were concerned, was effective as a sale by Johnson, which he was empowered to make under his contracts with them. Thus Johnson was simply accountable to Roberts and Hawley as a per-

sonal obligation from him to them upon the sale of the apples so made by Goodwin by the acquiescence of Johnson.

■ Contention is further made in behalf of Roberts, rested upon the theory that Goodwin has not been proven as having made any demand for payment of the indebtedness for which the apples were pledged through the transfer of the receipts from Johnson. We think the answer to this is that Goodwin was not required to make any such demand upon, or give any such notice to, Roberts or Hawley, since Goodwin had no dealings whatever with them. The sale of the apples being made by Goodwin with the consent of Johnson, of course, obviated the necessity of any notice or demand as between Goodwin and Johnson. The sale of the apples was, in its practical effect, as much a sale by Johnson as it was by Goodwin.

Contention is further made in behalf of Roberts, challenging the good faith of Goodwin in taking the pledge of the warehouse receipts and in making the sale of the apples. What we have already said, we think, disposes of this contention. As to the sale, it is enough to say that the evidence clearly shows that the apples were sold for the highest price obtainable, and that Johnson, in effect, received the full purchase price thereof. Of course, he was accountable therefor to Roberts and Hawley. It is not contended that the sale of the apples was untimely. We have seen, by the terms of the contracts between Johnson and Roberts and Hawley, that Johnson was the "sole and exclusive judge of the manner and time of selling said fruit and the price to be taken therefor."

Our conclusion renders it unnecessary to notice Goodwin's affirmative defense that another action is pending in Benton county, involving the same apples

392

or the proceeds thereof as are here involved in this second cause of action.

We conclude that the judgment must be affirmed. It is so ordered.

TOLMAN, C. J., MITCHELL, BEELER, and HERMAN, JJ., concur.